UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MATTHEW SERVELLO,

                              Plaintiff,

        -against-                                    1:18-CV-0777 (LEK/DJS)

NEW YORK STATE OFFICE OF
CHILDREN AND FAMILY SERVICES,

                              Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Matthew Servello, proceeding pro se, claims that his former employer, defendant New York State Office of Children and Family Services ("OCFS"), paid him less and failed to hire him at the appropriate position because of his gender, retaliated against him on the basis of his complaints about unequal pay, and created a hostile work environment, in violation of both the Equal Pay Act ("EPA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Dkt. No. 1 ("Complaint").

Defendant has now moved to dismiss the Complaint for failure to state a claim. Dkt. Nos. 9 ("Motion"), 9-2 ("Memorandum"), 11 ("Reply"). Plaintiff has filed a response in opposition to the Motion. Dkt. No. 10 ("Response").

For the reasons that follow, the Motion is granted as to Plaintiff's unequal pay and hostile work environment claims, but denied as to Plaintiff's failure-to-hire and retaliation claims.

## II.   BACKGROUND

The following facts are taken from the allegations in the Complaint, which are assumed to be true when deciding a motion to dismiss. Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012).

In November 2016, Plaintiff applied to take a civil service exam offered by the New York State Department of Civil Service ("NYSDCS"), in order to become a Child Protective Services Specialist 1 ("CPSS1"). Compl. ¶ 9. Plaintiff's exam performance and experience qualified him for the CPSS1 position at that time, and in January 2017 he received an "appointment letter" stating that he would be a CPSS1. Id. ¶¶ 9, 19. However, Defendant later told Plaintiff that NYSDC had altered the qualifications for the CPSS1 position in December 2016, making Plaintiff unqualified, and had created the "new position" of Child Protective Services Specialist Trainee ("CPSST"). Id. ¶¶ 9–10.

On February 2, 2017, Plaintiff began his employment with Defendant as a CPSST. Id. ¶ 10. That same day, Defendant hired five women in CPSS1 positions: Jacinta Cummings, Georgia Lanier, Jaclyn Wild, Alyse Rainer, and Shariva Reed. Id. ¶ 11. Plaintiff was "more qualified for the CPSS1 position" than Cummings, Reiner, and Reed because he had much more "'casework experience' and/or 'training.'" Id. ¶ 13. In his previous position with the Fulton County Department of Social Services ("FCDSS"), Plaintiff had been certified by New York State to investigate OCFS reports. Id. Cummings, Reiner, and Reed had not previously worked for a social services district nor conducted investigations. Id.

Plaintiff's job duties as a CPSST consisted of "receiving reports of suspect child abuse and maltreatment" via a hotline. Id. ¶ 12. Plaintiff "would screen calls for appropriateness,

evaluate the information, and prepare and transmit reported cases to local social services districts." Id. He also provided "technical assistance to local district staff." Id.

The five female employees and Plaintiff had "substantially the same duties," performed "substantially equal work" requiring "equal skill, effort, and responsibility" under "similar working conditions" at Defendant's Menands, New York location. Id. ¶¶ 14, 16–17. Additionally, Plaintiff and the five female CPSS1 employees "were given the identical CPSS1 Tasks and Standards and completed the identical 8-week training." Id. ¶ 15. However, Plaintiff had an annual salary of $42,143, whereas the five female employees, with a CPSS1 grade, had an annual salary of $49,727. Id. ¶¶ 16–17.

On February 2, 2017, his first day of employment, Plaintiff learned about the pay disparity and complained to Brian Washock, who held a CPSS3 position. Id. ¶ 19. Washock met with "management about the pay inequity," and then directed Plaintiff to call the Staffing Resources Liaison, Maria Tedesco. Id. Plaintiff informed Tedesco that an "appointment letter he received in January 2017 stated he was a CPSS1." Id. Tedesco "told [Plaintiff] that she made a 'mistake' and she sent a revised letter stating he was a CPSST later that day." Id. Plaintiff then complained to his union representative, Migdalia Ramos-Esslin. Id. ¶ 19.

On February 28, 2017, Plaintiff "raised the pay inequity complaint" with Defendant's Equal Employment Opportunity Diversity Director, Amelia Barbadoro, who told Plaintiff that "her office could not help with the situation" and that he should contact his union. Id. ¶¶ 21–22. Plaintiff then raised the issue with his union again. Id.

On March 10, 2017, Washock and CPSS2 Audrea Norton "issued [Plaintiff] an unwarranted employee counseling," despite the fact that Plaintiff was still in on-the-job training ("OJT") and therefore ineligible for "counseling." Id. ¶¶ 24, 26. After this counseling, Plaintiff

told Ramos-Ensslin that he believed the counseling was in retaliation for his February 2017 complaints. Id. ¶ 25. Ramos-Ensslin spoke with Acting Director Pamela Knowles about Plaintiff's training status and ineligibility for counseling. Id. ¶ 26.

On March 13, 2017, the counseling session "was dissolved," but Defendant ordered a new work arrangement for Plaintiff in response to "alleged performance concerns" raised by Washock and Norton. Id. ¶ 27. Moving forward, Plaintiff would "work with a supervisor 1 on 1 during his entire shift." Id. The supervisor listened to Plaintiff conduct each interview, and then Plaintiff "was required to consult with that supervisor on a recorded line to ensure he conducted a proper interview." Id. Further, Plaintiff had to ask the supervisor when he could take a break and take lunch. Id. No other trainee or employee faced such scrutiny. Id. ¶¶ 27–29. From March 13, 2017 through August 2, 2017, Plaintiff worked with approximately ten different supervisors in this arrangement. Id. ¶ 27. The supervisors reported to Washock on Plaintiff's performance. Id. ¶ 28. Defendant's "officials used any minor error or mistake against him in order to give him unwarranted employee counselings," in violation of the internal employee counseling policy. Id. ¶ 29. In addition, from March 13, 2017 through July 26, 2017, Defendant assigned Plaintiff tasks he had not covered in training "to ma[k]e him look like an incompetent employee." Id. ¶ 48.

On April 3, 2017, Norton "completed [Plaintiff's] first probationary report," which said that Plaintiff "moved to taking live calls well before he was slated to for his employee benchmarks." Id. ¶ 30. Plaintiff shifted to live calls "approximately two weeks" before Reiner and Lanier. Id. Norton "mentioned a few areas [where Plaintiff] needed improvement," but noted that "he was responding accordingly to the feedback given to him." Id. Plaintiff "did not have a single unsatisfactory performance factor," and throughout his time in OJT never had to work

with Laurie Smith, the supervisor to whom employees "struggl[ing]" with OJT were assigned.
Id. ¶¶ 30, 36.

On April 6, 2017, Knowles and Washock informed Plaintiff that he had completed OJT.
Id. ¶ 31. Of the five female CPSS1s hired alongside Plaintiff, only four completed the OJT
process. Id. ¶ 33.

When Plaintiff interviewed with Defendant in January 2017, he "agreed to work"
Tuesday through Saturday, from 4 PM to 12 AM. Id. ¶ 32. All of the four female CPSS1s that
completed training were given this shift. Id. ¶ 33. But, allegedly in retaliation, Defendant instead
placed Plaintiff on a Monday through Friday, 2 PM to 10 PM shift, "in order to place [Plaintiff]
with a particular supervisor that . . . Knowles knew would terminate him at any cost and/or cause
a constructive discharge." Id. ¶ 34–35. Then from April 6, 2017 through May 5, 2017, Defendant
assigned Plaintiff to work with Smith on a different shift, from 9 PM to 5 PM.[1] Id. ¶ 37. "No
other similar[ly] situated employees were mandated to work with Ms. Smith." Id. In instituting
this shift change, Knowles "apologized" to Plaintiff and "hoped the schedules would not
interfere with his 'family life.'" Id. ¶ 38. Eventually, on May 4, 2017, Smith informed
Defendant's "management" that Plaintiff's work "was satisfactory," and he transferred to the
unit supervised by Tracy Santangelo, CPSS2.  Id. ¶ 39.

On May 5, 2017, a representative from Plaintiff's union reached out to the NYSDCS
about Plaintiff's concerns regarding his pay inequity, as well as Plaintiff's status as a CPSST

---

[1]  The Complaint actually describes this shift as 9 "P.M." to 5 "P.M." Id. ¶ 37. However,
the Court assumes—in view of the fact that all other shifts described in the Complaint are eight
hours—that the "9 P.M." is a typographical error.

after initially qualifying for CPSS1. Id. ¶ 40. NYSDCS then relayed those concerns to Defendant.  Id.

On May 12, 2017 and June 2, 2017, Washock and Santangelo gave Plaintiff his second and third "unwarranted employee counseling," and placed "written documentation" in his "Personal History Folder." Id. ¶ 41–42. Santangelo cited Plaintiff for using "inappropriate language" because he said "dick," despite the fact that Santangelo had a cartoon up in her cubicle that included the terms "bitches" and "motherfucker." Id. ¶ 42. Plaintiff alleges that this, too, was "retaliation." Id. 41–42.

From March 13, 2017 through July 26, 2017, Santangelo "ridiculed and put down Plaintiff," and "isolated" him for hours as a time, explaining that Plaintiff was "different" from other employees and not their "friend." Id. ¶¶ 49–51. Santangelo also "berated" Plaintiff for following her "inconsistent" directives, emailed him policies in an "intimidating/threatening manner," and required that Plaintiff inform her whenever he left his desk. Id. ¶¶ 50, 52–53. "No other similarly situated employees were treated the same." Id. ¶ 49.

On June 7, 2017, Plaintiff told Washock that his working relationship with Santangelo was "toxic." Id. ¶ 43. Washock advised hitting the "reset button," but took no further action. Id. On June 8, 2017, Plaintiff told Ramos-Esslin about being targeted by Defendant because of his complaints. Id. ¶ 44. Plaintiff requested a transfer to a different supervisor "in an effort to stop the harassment and hostile work environment." Id. Ramos-Esslin spoke with Washock about transferring Servello to another supervisor, noting the positive feedback on Plaintiff's performance from other supervisors, but Washock "ignored" Ramos-Esslin's request. Id. ¶ 45.

On June 14, 2017, Washock and Santangelo issued Plaintiff a fourth "unwarranted employee counseling," and a second "memo" was placed in his Personal History Folder. Id. ¶ 46.

Directly after that counseling, Washock reviewed with Plaintiff his performance during a recent "complex and convoluted interview," saying he did a "great job," contradicting the message of the just-concluded counseling session. Id.

Between June 20 and July 26, 2017, a number of events occurred in quick succession. First, on June 20, Defendant's "high ranking" officials held a conference call and recommended "terminating [Plaintiff's] probation." Id. ¶ 54. Then, on June 29, Santangelo and CPSS3 Dan Donahue issued Plaintiff his fifth "unwarranted" counseling and placed a third memo in his Personal History Folder. Id. ¶ 55. Two weeks later, on July 10, Santangelo completed Plaintiff's second probationary evaluation and requested his termination, noting three "unsatisfactory performance factors." Id. ¶ 56. Acting Director Sehlia McBain approved and signed Plaintiff's "probation termination paperwork" three days later, on July 13. Id. ¶ 57. Then, on July 20, CPSS4 Kristin Gleeson sent an email to HR about Plaintiff being "smug" and challenging his supervisors. Id. ¶ 58. Gleesen also wrote that Plaintiff's independence and performance lagged behind two other trainees. Id. Finally, on July 26, 2017, Washock and Santangelo gave Plaintiff his "second probation evaluation," and Defendant terminated Plaintiff's employment. Id. ¶ 59.

On August 18, 2017, Defendant "attempted to deny [Plaintiff]'s unemployment benefits," by informing the New York Department of Labor ("DOL") that Plaintiff had been fired for "attitude problems," not work performance. Id. ¶ 60. After a rebuttal from Plaintiff, DOL awarded him unemployment benefits. Id.

On September 28, 2017, Plaintiff sent an email to Defendant's "management about the treatment he had endured as . . . Santangelo's subordinate." Id. ¶ 61. And on October 3, 2017, Santangelo, allegedly in retaliation, filed a complaint with the Village of Menands Police Department "in an effort to get [Plaintiff] arrested." Id.

In December 2018, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Defendant, and on June 15, 2018, the EEOC issued Plaintiff a right-to-sue letter. Compl. at 21. Plaintiff filed this suit two weeks later. Id.

## III.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient matter . . . 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In assessing whether this standard has been met, courts take "all factual allegations contained in the complaint" as true, Twombly, 550 U.S. at 572, and "draw all inferences in the light most favorable to the non-moving party," In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007) (internal citation omitted). However, it is "well settled that conclusory allegations merely stating general legal conclusions necessary to prevail on the merits of a claim, unsupported by factual averments will not be accepted as true." ECOR Solutions, Inc. v. Malcolm Pirnie, Inc., No. 02-CV-1103, 2005 WL 1843253, at *3 (N.D.N.Y. July 29, 2005). A "plaintiff's obligation to provide the grounds of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

That said, a document filed pro se is to be liberally construed, and a pro se complaint is held to less stringent standards than formal pleadings drafted by lawyers. Fowlkes v. Ironworkers Local 40, 790 F.3d 378, 387 (2d Cir. 2015). Accordingly, where a plaintiff litigates pro se, "we

read his papers liberally and interpret them to raise the strongest arguments that they suggest."

Gerstenbluth v. Credit Suisse Sec. (USA) LLC, 728 F.3d 139, 142 (2d Cir. 2013).

## IV.   DISCUSSION

### A.   Unequal Pay Claim under the EPA and Title VII

Plaintiff bases his unequal pay claim on his allegation that Defendant paid Plaintiff, who is male, less than certain female employees who were performing "substantially equal work" on a job requiring "equal skill, effort, and responsibility" under similar working conditions. Compl. ¶¶ 14–18, 62–67, 76–79.

The EPA "prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for equal work." Ryduchowski v. Port Authority, 203 F.3d 135, 142 (2d Cir. 2000). To state a claim under the EPA, a plaintiff must allege (1) the payment of different wages to employees of the opposite sex; (2) that the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) that the jobs are performed under similar working conditions. Id. A discrimination claim for unequal pay under Title VII is generally analyzed under the same standards as the EPA, with the exception that intentional discrimination is required under Title VII, but not the EPA. Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995), abrogated on other grounds by Burlington Indus. Inc. v. Ellerth, 524 U.S. 742 (1998).

"Bald allegations" that employees of one gender were paid more than employees of another gender "will not survive a motion to dismiss." Suzuki v. State Univ. of New York Coll. at Old Westbury, No. 08-CV-4569, 2013 WL 2898135, at *4 (E.D.N.Y. June 13, 2013). As the Suzuki court found, "the Second Circuit and district courts [have] expressly held that . . . conclusory allegations could not withstand a Rule 12(b)(6) motion to dismiss an EPA claim" and that "district courts have also dismissed EPA claims where a plaintiff failed to allege how his or

her position and the comparison position were substantially similar." Id. In Suzuki, for example, the plaintiff simply alleged that she and other female professors were paid less than male professors, "although she performed equal or superior work and had equal or better qualifications and experience." Id. The district court there dismissed for failure to state a claim because the conclusory allegations failed to convey how the positions were substantially similar. Id.

Here, Plaintiff has adequately alleged that female employees received higher annual salaries of $49,727 each, as compared to Plaintiff's $42,143 salary, satisfying the first prong for an EPA claim. Compl. ¶¶ 16–17. However, Plaintiff recites the other elements of an EPA claim without alleging sufficient facts to support them. He alleges that the duties "required substantially equal work . . . requir[ing] equal skill, effort and responsibility . . . under similar working conditions," and that they got the same training. Compl. ¶¶ 14–15. He reiterates these elements without further explanation when he alleges that they had "substantially the same duties" and performed "substantially the same work." Id. ¶¶ 17–19. Plaintiff puts some meat on the bone by describing his own duties, see id. ¶ 12 ("receiving reports of suspected child abuse and mistreatment via the SCR telephone hotline[,] . . . screen[ing] calls for appropriateness, evaluat[ing] the information, and prepar[ing] and transmit[ting] reported cases to local social services districts"), and by alleging that he and the female employees received "identical CPSS1 Tasks and Standards." Id. ¶¶ 15–16. This suggests that the descriptions of Plaintiff's tasks apply equally to the female employees' tasks, meaning they had substantially similar substantive duties.

However, the inquiry into whether jobs are "substantially equal" in skill, effort, and responsibility and performed under similar condition does not end with a comparison of substantive duties. "It is not uncommon that two employees perform certain tasks together but

only one is held accountable for the results. In this situation, the employees may be said to perform the same duties, but their jobs are not substantially equal in responsibility." Chepak v. N.Y.C. Health & Hosps. Corp., No. 11-CV-9698, 2015 WL 509279, at *11 (S.D.N.Y. Feb. 5, 2015), aff'd, 643 F. App'x 62 (2d Cir. 2016); see also 29 C.F.R. § 1620.17 ("Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation."). Plaintiff has not plausibly alleged the relative accountability of his and the female CPSS1 positions, except insofar as he describes Defendant's alleged post-March 13 retaliatory campaign against Plaintiff, which resulted in dramatically less responsibility for Plaintiff as compared to the female employees. Compl. ¶¶ 27–29. Such comparison of responsibilities is especially important here, as Plaintiff's trainee title on its face suggests less responsibility than the comparator CPSS1 title.

Accordingly, having failed to plausibly allege that he and the female employees' duties required substantially equal responsibility, Plaintiff fails to make out an unequal pay claim, under either the EPA or Title VII.

### B. Failure-to-Hire Claim under Title VII

Liberally construed, Plaintiff's Complaint also attempts to allege a gender-based failure-to-hire claim under Title VII, because Defendant hired five women in the CPSS1 position, but only hired the male Plaintiff as a Trainee. Id. ¶ 13.

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" based on a protected characteristic, such as gender. § 2000e-2. To sufficiently plead the existence of gender discrimination at the motion to dismiss stage, a plaintiff must allege that: (1) he belongs to a protected class, (2) he was qualified for the

job, (3) he suffered an adverse employment action, and (4) he "has some minimal evidence suggesting an inference that his employer acted with discriminatory motivation." Littlejohn v. City of New York, 795 F.3d 297, 307 (2d Cir. 2015).

However, at the pleading stage, a plaintiff is not required to plead facts sufficient to establish a prima facie case, and need only allege sufficient facts to give the defendant "fair notice of the basis for [plaintiff's] claims." Boykin v. Keycorp, 521 F.3d 202, 212 (2d Cir. 2008). Consistent with this approach, the Second Circuit has affirmed that there is no heightened pleading requirement in employment discrimination cases, even after Twombly and Iqbal. DiPetto v. U.S. Postal Serv., 383 F. App'x 102, 103 (2d Cir. 2010). As the Supreme Court explained in Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), imposing a heightened pleading standard in employment discrimination cases would be inappropriate because these cases frequently involve facts not available to a plaintiff at the pleading stage. See also id. at 512 ("Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case. Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases."); Leibowitz v. Cornell Univ., 445 F.3d 586, 592 (2d Cir. 2006) ("'[T]he Federal Rules do not contain a heightened pleading standard for employment discrimination suits.'" (quoting Swierkiewicz, 534 U.S. at 515)).

Plaintiff's Complaint sets forth facts directly supporting the first three elements of a prima facie employment discrimination claim—namely, that he is in a protected class based on his gender, that he was qualified for the CPSS1 position based on his prior experience working at FCDSS investigating OCFS reports, Compl. ¶ 13, and that he suffered an adverse employment action by not being hired as a CPSS1, id. ¶¶ 9–10.

12

As to the fourth prong, gender-based discriminatory intent, however, Plaintiff alleges that the five individuals hired for the CPSS1 position were female, and Plaintiff had more "casework experience" than three of them. Id. ¶ 13. At the pleading stage, a plaintiff's allegations "need only give plausible support to a minimal inference of discriminatory motivation." Id., 795 F.3d at 311. "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Id. at 312 (quoting Leibowitz, 584 F.3d at 502). Therefore, though Plaintiff's bare allegations of disparate treatment might not carry the day at the summary judgment stage, see, e.g., Tomka, 66 F.3d at 1310 (dismissing Title VII claim where the plaintiff's only evidence of intentional gender-based discrimination was the fact that three male employees were paid higher salaries than she was), they are sufficient at the pleading stage to give rise to a minimal inference of discrimination. Kalola v. Int'l Bus. Machines Corp., No. 13-CV-7339, 2015 WL 861718, at *7 (S.D.N.Y. Feb. 3, 2015), (finding that disparate treatment (the more favorable treatment of employees not in the protected group) is a "common and especially effective method of establishing the inference of discriminat[ion]" (citing Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001)); see also Levitant v. N.Y.C. Human Res. Admin., 625 F. Supp. 2d 85, 101 (E.D.N.Y. 2008) ("An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications . . . or if the position was filled by someone not a member of plaintiff's protected class." (internal quotation marks and citations omitted)).

Defendant's Motion as to Plaintiff's failure-to-hire claim is therefore denied.

### C. Retaliation

Plaintiff also alleges that he suffered retaliation in the form of discipline and termination for his complaints about unequal pay, in violation of both the EPA and Title VII. Compl. ¶¶ 68–75, 76–79.

To make out a prima facie case of retaliation, whether under the EPA or Title VII, a plaintiff must allege that (1) he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action. Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012); see also Pfeiffer v. Lewis Cty., 308 F. Supp. 2d 88, 106–07 (N.D.N.Y. 2004) (applying same prima facie elements to EPA and Title VII retaliation claims). The Court addresses each prong in turn.

#### 1. Protected Activity

What constitutes protected activity differs under each of the statutes invoked. Pfeiffer, 308 F. Supp. 2d at 106–07 (N.D.N.Y. 2004)

"The EPA is an amendment to the [Fair Labor Standard Act (FLSA)] and is codified under the same chapter; thus retaliation for filing EPA complaints falls under 29 U.S.C. § 215(a)(3)" of FLSA's anti-retaliation provision. Lambert v. Genesee Hosp., 10 F.3d 46, 55 (2d Cir. 1993). FLSA's anti-retaliation provision makes it unlawful to "discharge or in any manner discriminate against any employee because such employee has filed any complaint." § 215(a)(3). Contrary to Defendant's contention that only formal, written complaints constitute protected activity, Mem. at 12, both written and oral complaints are protected. Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 4 (2011). Thus, to state a retaliation claim under the EPA, Plaintiff must show only that he raised the issue of potentially "gender-related" disparate pay for substantially similar work; he need not have cited the EPA or accused Defendant of illicit

14

conduct in so doing. <u>Chen-Oster v. Goldman, Sachs & Co.</u>, 293 F.R.D. 557, 564 (S.D.N.Y. 2013).

Similarly, under Title VII, "protected activity" includes "informal protests of discriminatory employment practices, including making complaints to management." <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990).

Plaintiff alleges that he raised the issue of equal pay with Washock, a CPSS3, on February 2, 2017. Compl. ¶ 19. Washock then met with OCFS management about pay inequity, after which he directed Plaintiff to call the Staffing Resources Liaison, Maria Tedesco, about his concern. <u>Id.</u> Plaintiff did so, and Tedesco told Plaintiff that she had made a mistake as to his position in his appointment letter, and that he was in fact a CPSST. <u>Id.</u> On February 28, 2018, Plaintiff raised his pay inequity complaint with Defendant's Equal Employment Diversity Director, Amelia Barbadoro, who informed him that her office could not help with the situation. <u>Id.</u> ¶ 21. Such complaints to management, though informal, constituted protected activity under both the EPA and Title VII. <u>See</u> <u>Moccio v. Cornell Univ.</u>, 889 F. Supp. 2d 539, 584 (S.D.N.Y. 2012) (holding that plaintiff's request that management look into gender-based unequal pay constituted protected activity under Title VII), <u>aff'd</u>, 526 F. App'x 124 (2d Cir. 2013).[2]

### 2. *Employer Awareness*

An employer is aware of a protected activity when it "understood, or could reasonably have understood, that the plaintiff's opposition was directed at" prohibited conduct. <u>Galdieri-</u>

---

[2] Plaintiff also alleges that, months after his termination, he sent an email to OCFS management about "the treatment he endured as Ms. Santangelo's subordinate," but Plaintiff does not provide any further details about the content of the e-mail. Compl. ¶ 61. As generalized complaints about a supervisor's treatment are insufficient to constitute protected activity, <u>Rojas</u>, 660 F.3d at 108, Plaintiff's allegations regarding this email fail to plausibly allege a protected activity.

Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir.1998). "Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice." Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 92 (2d Cir.2011). "'Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.'" Id. (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)).

Plaintiff's complaints to his managers satisfy both the EPA's and Title VII's awareness prong. See Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 270 (S.D.N.Y. 2007) (complaints to supervisor "clearly satisfy" the knowledge aspect of the prima facie standard).

### 3. Materially Adverse Action

Within the context of a retaliation claim, employer actions "are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). Whether an employer's action could dissuade a reasonable employee, situated similarly to the plaintiff, from making a charge of discrimination is an objective determination. Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011). To be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation marks omitted). "'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims." Millea v. Metro-North R.R., 658 F.3d 154, 165 (2d Cir. 2011) (quoting Burlington N., 548 U.S. at 68). However, "alleged acts of retaliation

must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." Id. at 568. "[E]ven minor acts can be sufficiently substantial in gross as to be actionable." Hicks, 593 F.3d at 165 (internal quotation marks omitted).

Plaintiff points to the following actions as retaliatory: (1) his "unwarranted" discipline in the form of employee counseling sessions, Compl. ¶¶ 24, 41–42, 46, 55; (2) the "scrutiny" of one-on-one supervision with a challenging supervisor, id. ¶¶ 27–37; Id. 32, 35; (3) his change in shift, id. ¶¶ 32, 34–35, 38; (4) his negative performance evaluations, id. ¶¶ 42, 46; (5) the insults and isolation he suffered, id., ¶¶ 49-52; (6) his termination, id., ¶ 59; and (7) Defendant's attempt to deny him unemployment benefits, id. ¶ 60.[3]

Employment termination alone constitutes materially adverse action, Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 79 (2d Cir. 2015), as do "bad performance reviews," Siddiqi v. N.Y. City Health & Hospitals Corp., 572 F. Supp. 2d 353, 372 (S.D.N.Y.2008). Therefore, Plaintiff's allegations regarding his bad performance reviews and termination are sufficient at this stage, even standing alone, to plead the existence of materially adverse actions.

However, each of the rest of Plaintiff's alleged retaliatory actions would not, on their own, constitute materially adverse actions. See Miller v. McHugh, 814 F. Supp. 2d 299, 321 (S.D.N.Y. 2011) (finding that counseling sessions do not rise to the level of adverse employment

---

[3] Plaintiff also alleges adverse action in the form of Santangelo filing a complaint with the local police department "in an effort to get Plaintiff arrested." Compl. ¶ 61. However, Plaintiff himself alleges that the police report was not part any sustained campaign against him prompted by Plaintiff's complaints about unequal pay (the protected activity). Id. Rather, Plaintiff alleges that his September 28, 2017 email to OCFS management about "the treatment he endured as Ms. Santangelo's subordinate" prompted the October 3, 2017 police complaint. Id. And as previously noted, Plaintiff has not plausibly alleged that the email constituted protected activity. See supra, fn 2. It therefore cannot provide the basis for a retaliation claim.

action); Chang v. Safe Horizons, 254 F. App'x 838, 839 (2d Cir. 2007) ("[A]pplication of the [employer's] disciplinary policies to [the employee] without more, does not constitute adverse employment action."); Chacko v. Connecticut, No. 07-CV-1120, 2010 WL 1330861, at *13 (D. Conn. Mar. 30, 2010) ("To qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences."); Hicks, 593 F.3d at 165 (finding that a schedule change constitutes a material adverse action only if the change makes a meaningful difference to the particular employee, for example a young mother with school-age children); Monroe v. Xerox Corp., 664 F. Supp. 2d 235, 245 (W.D.N.Y. 2009) (finding that a supervisor's "general[] antagonis[m]" toward employee was not adverse); Jenkins v. St. Luke's-Roosevelt Hosp. Ctr., No. 09-CV-12, 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) ("[I]t is well-settled that an employer's actions in objecting to the provision of unemployment benefits to a former employee is not an adverse employment action cognizable under the employment discrimination laws.").

That said, all of Plaintiff's alleged retaliatory actions can be aggregated, Tepperwien, 663 F.3d at 567, and taken as a whole they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination," Burlington N., 548 U.S. at 57. Construed liberally, the Complaint alleges that these retaliatory actions and environment were part of an overarching course of conduct to punish Plaintiff for complaining about pay inequity and (except with regards to the police report and unemployment benefits) to terminate his employment. Compl. ¶¶ 28–29 (alleging increased supervision and scrutiny was put in place "in order to give [Plaintiff] unwarranted employee counselings"), ¶¶ 53–54 (alleging that employer held Plaintiff to a different standard, resulting in termination); ¶ 35 (alleging that Plaintiff's shift change was enacted in order to put him under more strenuous supervision and have him terminated). Accordingly, in the aggregate, the retaliatory actions alleged by Plaintiff

also constitute materially adverse action. See Corrado v. N.Y. State Unified Court Sys., No. 12-CV-1748, 2014 WL 4626234, at *11 (E.D.N.Y. Sept. 15, 2014) (finding that increased supervision, unreasonable workloads, required counseling sessions, and denial of transfer, in the aggregate, constituted materially adverse action).

### 4. Causal Connection

To sufficiently plead that a defendant-employer took an adverse employment action "because" the plaintiff opposed an unlawful employment practice, the plaintiff "must plausibly allege that the retaliation was a 'but for' cause of the employer's adverse action." Vega, 801 F.3d at 90 (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013)). But-for causation does not require that retaliation "was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Id. at 91.

A causal connection between the protected activity and the adverse action can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." Littlejohn, 795 F.3d at 319.

There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (internal quotation marks and citation omitted). Each temporal analysis must be made within the context of a case. However, the Court of Appeals for the Second Circuit has determined that seven months is not too long to establish a causal relationship, Summa v. Hofstra Univ., 708 F.3d 115, 127–29 (2d Cir. 2013), while fifteen months or two years is too long, Woodworth v. Shinseki, 447 F. App'x. 255, 258 (2d Cir. 2011) (fifteen months); Richardson v.

<u>N.Y. State Dep't of Corr. Serv.</u>, 180 F.3d 426, 447 (2d Cir. 1999) (two years) <u>abrogated on other grounds by</u> <u>Burlington N.</u>, 548 U.S. at 68).

Plaintiff complained about unequal pay on February 2 and 28, 2017, and was terminated on July 26, 2017, Compl. ¶¶ 19, 59–60, a span of five-and-a-half-months. But the relevant timeframe is in fact shorter. Plaintiff has alleged a course of conduct that in the aggregate constitutes a materially adverse action. That course of conduct began with the imposition of employee counseling on Plaintiff on March 10, 2017, only five weeks after Plaintiff initially complained, and less than two weeks after his February 28 a follow-up complaint about unequal pay. Compl. ¶¶ 21, 24. And the course of conduct continued through termination, with periodic negative evaluations, required counseling, and increased scrutiny. <u>Id.</u> ¶¶ 27–38, 41, 42, 46, 49–52, 55.

Given the temporal proximity of Plaintiff's protected activity and adverse actions, a matter of less than two weeks, Plaintiff plausibly alleges that a causal relationship existed between his protected activity and Defendant's allegedly retaliatory behavior. <u>See</u> <u>Summa</u>, 708 F.3d at 127–29.

Plaintiff has plausibly alleged each element of a retaliation claim, and Defendant's request to dismiss that claim is therefore denied.

### B.  Hostile Work Environment

Plaintiff also alleges a hostile work environment claim. Compl. ¶¶ 88–93.

To state a claim for hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show "that the complained of conduct (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive;

and (3) creates such an environment because of the plaintiff's sex or another protected characteristic." Robinson v. Harvard Prot. Servs., 495 F. App'x 140, 141 (2d Cir. 2012).

Plaintiff alleges that the cumulative effect of the retaliatory actions detailed earlier created a hostile work environment. Compl. ¶¶ 88–93. However, considering those actions within the context of a stand-alone hostile work environment claim would be largely duplicative of Plaintiff's retaliation claim. Accordingly, Plaintiff's hostile work environment allegations survive not as a separate claim, but only insofar as they support of Plaintiff's retaliation claim. See Richardson, 180 F.3d 426, 446 (2d Cir. 1999) (treating retaliatory harassment allegations under the adverse action prong of a retaliation claim, not a stand-alone hostile work environment claim), abrogated on other grounds by Burlington, 548 U.S. at 68. Plaintiff's hostile work environment claim is therefore dismissed.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Motion (Dkt. No. 9) is **GRANTED** as to the following claims, which are **DISMISSED without prejudice**:[4] (1) Plaintiff's unequal pay claim under the EPA and Title VII; and (2) Plaintiff's Title VII hostile work environment claim; and it is further

---

[4] Plaintiff is advised that if he moves to revive these dismissed claims via an amended complaint with additional factual allegations, such an amended complaint completely replaces the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). Consequently, any amended complaint must include all allegations such that it can stand alone as the sole complaint in this action.

**ORDERED**, that the Motion is **DENIED** as to the following claims: (1) Plaintiff's

failure-to-hire Title VII claim; and (2) Plaintiff's retaliation claim under the EPA and Title VII;

and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order upon the parties in this action in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        February 28, 2019
              Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge