UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MATTHEW SERVELLO,

                             Plaintiff,

        -against-                                    1:18-CV-0777 (LEK/DJS)

NEW YORK STATE OFFICE OF
CHILDREN AND FAMILY SERVICES,

                             Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Matthew Servello originally commenced this action against defendant New York State Office of Children and Family Services ("OCFS") alleging civil rights violations under Title VII of the Civil Rights Act and the Equal Pay Act ("EPA"). Dkt. No. 1 ("Complaint"). Presently before the Court is Defendant's motion for summary judgment, and Plaintiff's cross-motion to amend the Complaint and in opposition to Defendant's motion. Dkt. Nos. 63 ("Motion"), 63-8 ("Defendant's Statement of Material Facts"), 63-9 ("Defendant's Memorandum of Law"), 64 ("Cross-Motion"), 64-33 ("Plaintiff's Response to Defendant's Statement of Material Facts"), 64-34 ("Plaintiff's Memorandum of Law"), 71 ("Reply"). For the following reasons, the Court grants Defendant's motion and denies Plaintiff's cross-motion.

## II.     BACKGROUND

### A.  Factual History

The following facts are undisputed, except where otherwise noted.

Defendant is an executive agency of New York State. Def.'s SMF ¶ 1; Pl.'s Resp. to Def.'s SMF ¶ 1. It operates the Statewide Central Register ("SCR"), a call center that receives and processes reports of violence, neglect, and abuse of minors. Def.'s SMF ¶ 2; Pl.'s Resp. to Def.'s SMF ¶ 2. SCR is staffed primarily with Child Protective Services Specialists. Def.'s SMF ¶ 3; Pl.'s Resp. to Def.'s SMF ¶ 3.

### 1. Creation of Traineeship

Prior to December 2016, the entry-level position for Child Protective Services Specialists at SCR was Child Protective Services Specialist 1 ("CPSS1"), with a salary of $42,833. Def.'s SMF ¶ 4; Pl.'s Resp. to Def.'s SMF ¶ 4; see Dkt. No. 63-5, Ex. 1. The New York State Department of Civil Service ("Civil Service") set the qualifications for a CPSS1 as: (i) a bachelor's degree in any field and either (ii) one year of experience directly providing child protective services at least fifty percent of the time, or (iii) two years of experience working directly in child welfare programs such as prevention, foster care, or adoption services. Def.'s SMF ¶ 5; Pl.'s Resp. to Def.'s SMF ¶ 5; see Dkt. No. 63-5, Ex. 1.

According to Defendant, Civil Service revised the minimum qualification standards for a CPSS1 in December 2016, raising the salary to $47,796, and at the same time, created the Child Protective Service Specialist Trainee ("CPSST") position with a salary of $40,507. Def.'s SMF ¶ 6; see Dkt. No. 63-5, Exs. 2, 4. According to Plaintiff, the CPSST position was not established until March 16, 2017, at the earliest, Pl.'s Resp. to Def.'s SMF ¶ 6; see Dkt. No. 64-11 ("certification of eligibles" list for the CPSST position with an issue date of March 16, 2017), or March 28, 2017, see Dkt. No. 64-12 (memo stating the first eligible list was established March 28, 2017).

Defendant contends that the new minimum qualifications for the CPSS1 position, instated in December 2016, were: (i) a bachelor's degree in a human services field (no work experience needed); or (ii) an associate's degree in a human services field, plus two years' experience directly providing child protective services at least fifty percent of the time; or (iii) four years of experience (no degree required) with working directly in child welfare programs such as prevention, foster care, or adoption services. Def.'s SMF ¶ 7; see Dkt. No. 63-5, Ex. 2. Plaintiff argues these qualifications are irrelevant because they were put in place after he was hired. Pl.'s Resp. to Def.'s SMF ¶ 7.

A human services degree was defined by Civil Service as "[a]udiology, community mental health, nursing, nutrition, occupational therapy, physical therapy, psychology, rehabilitation counseling, social work, speech/language pathology, therapeutic recreation, gerontology, human services, sociology, speech communication, counseling education, and human development." Def.'s SMF ¶ 9; Pl.'s Resp. to Def.'s SMF ¶ 9; see Dkt. No. 63-5, Ex. 2.

Defendant asserts that the minimum qualifications for the new CPSST position, instated in December 2016, were: (i) a bachelor's degree or higher in any field (no work experience needed); or (ii) an associate's degree in any field, and two years working directly for child welfare programs, such as foster care or adoption services; or (iii) four years of experience working directly for child welfare programs, such as prevention, foster care, or adoption services. Def.'s SMF ¶ 8; see Dkt. No. 63-5, Ex. 2. Again, Plaintiff argues these qualifications are irrelevant. Pl.'s Resp. to Def.'s SMF ¶ 8.

Defendant also claims that the determinations to create the CPSST title and change the minimum qualifications of the CPSS1 title were made solely by Civil Service, and that

Defendant did not direct, mandate, or require Civil Service to revise the CPSS1 requirements or create the CPSST title. Def.'s SMF ¶¶ 15–16. Plaintiff argues the changes were the result of a collaboration between OFCS and Civil Service. Pl.'s Resp. to Def.'s SMF ¶¶ 15–16; Dkt. No. 64-3 ("Servello Affidavit") ¶ 24.

### 2. Differences in the Positions

According to Defendant, the CPSST title was the entry level of the series and required successful completion of a twelve-month traineeship, after which a trainee would advance to the CPSS1 title. Def.'s SMF ¶ 10; see Dkt. No. 63-5, Ex. 2. The trainee's performance would be closely "observed and evaluated," as noted in the classification standards. Def.'s SMF ¶ 11; see Dkt. No. 63-5, Ex. 2. And the traineeship would include "extensive on-the-job training" and "carefully designed and monitored work experience." Def.'s SMF ¶ 12; see Dkt. No. 63-5, Ex. 2.

Plaintiff argues there was no clearly established rule allowing for promotion from CPSST to CPSS1 when Plaintiff was hired, and that Plaintiff was not notified he would undergo additional on-the-job scrutiny. Pl.'s Resp. to Def.'s SMF ¶¶ 10–11. Further, Plaintiff asserts that two CPSS1s were given "far more training and support opportunities" than he was. Id. ¶ 12; Servello Aff. ¶ 16.

The parties agree that a CPSST who did not meet the required standards could be terminated any time after the first eight weeks of the traineeship and up until its completion. Def.'s SMF ¶ 13; Pl.'s Resp. to Def.'s SMF ¶ 13. The parties also agree that both CPSSTs and CPSS1s were subject to a fifty-two-week probationary period, during which time Defendant could terminate an appointee if he or she did not meet the required standards. Def.'s SMF ¶ 14; Pl.'s Resp. to Def.'s SMF ¶ 14; see Dkt. No. 63-5, Ex. 2.

4

### 3. *Hiring*

In November 2016, Plaintiff applied to Civil Service for employment with Defendant as a CPSS1. Def.'s SMF ¶ 17; Pl.'s Resp. to Def.'s SMF ¶ 17. At that time, Plaintiff held a bachelor's degree in business administration—not considered a human services degree by Civil Service—and had been employed by the Fulton County Department of Social Services for approximately thirteen months. Def.'s SMF ¶¶ 18, 22; Pl.'s Resp. to Def.'s SMF ¶¶ 18, 22. Civil Service deemed Plaintiff eligible for the CPSS1 title and placed him on the eligible list for that position. Def.'s SMF ¶ 19; Pl.'s Resp. to Def.'s SMF ¶ 19.

Defendant argues that in December 2016, Civil Service revised the minimum requirements for the CPSS1 title. Def.'s SMF ¶ 20. Then, pursuant to 4 NYCRR § 4.1, Civil Service generated a list of eligible employees for the CPSST and CPSS1 positions, which designated Plaintiff as an eligible candidate for the CPSST position. Def.'s SMF ¶ 25; See Dkt. No. 63-5, Ex. 4. Using this list, Defendant sent canvass letters to eligible candidates, including Plaintiff, inquiring about their interest in working at SCR. Def.'s SMF ¶ 27; Pl.'s Resp. to Def.'s SMF ¶ 27. The canvass letters referenced only the CPSS1 title. Def.'s SMF ¶ 29; Pl.'s Resp. to Def.'s SMF ¶ 29. Defendant asserts this was because it had chosen to inform candidates of the changes to the minimum qualifications of the CPSS1 title and the creation of the CPSST title during the interview process. Def.'s SMF ¶ 28.

Plaintiff, as described above, argues that the certified eligible list was not created until mid to late March 2017. Def.'s SMF ¶ 25.

Plaintiff responded to the canvass letter and was selected for an interview. Def.'s SMF ¶ 30; Pl.'s Resp. to Def.'s SMF ¶ 30. Defendant claims that before and during the interview,

Plaintiff was informed he was being considered for the CPSST position. Def.'s SMF ¶ 31.

Plaintiff admits in a phone call before the interview he was told only that the CPSST position

was a "possibility." Pl.'s Resp. to Def.'s SMF ¶ 31

> After the interview, Plaintiff contacted Defendant's human resources department and

asked why he was not being considered for the CPSS1 position. See Dkt. No. 63-2 ("Servello

Deposition") at 57:23–58:9. Defendant contends that Plaintiff was told Civil Service, not

Defendant, had changed the minimum qualifications for the CPSS1 position and determined that

Plaintiff was no longer eligible. Plaintiff also contacted Civil Service and was told he was no

longer eligible for the CPSS1 position. Def.'s SMF ¶ 33; Pl.'s Resp. to Def.'s SMF ¶ 33.

> Subsequently, Defendant sent Plaintiff a letter, dated January 27, 2017, confirming his

appointment as a Child Protect Services Specialist 1 at salary grade 16. See Dkt. 64-15, Ex. 12.

When Plaintiff later contacted the Staffing Resources Liaison who sent him this letter, she then

sent a revised letter stating Plaintiff was appointed as a CPSST. Servello Aff. ¶ 26. Plaintiff's

employment with Defendant began on February 2, 2017. Def.'s SMF ¶ 39; Pl.'s Resp. to Def.'s

SMF ¶ 39.

> At or about the same time, Defendant also hired five women—Jacinta Cummings,

Georgia Lanier, Jacklynn Wild, Alyse Reiner, and Shariva Reed—who held bachelor's degrees

or higher in a human services field and/or the work experience to qualify as CPSS1s under the

revised qualifications. Def.'s SMF ¶¶ 36–37; Pl.'s Resp. to Def.'s SMF ¶¶ 36–37.

---

[1]  Although Plaintiff only admits this in part, his dispute—as the Court construes it—does
not create a genuine issue of material fact.

### 4. Training and Disputes over Title and Salary

Plaintiff's first placement at SCR was an eight-week training course. Def.'s SMF ¶ 40; Pl.'s Resp. to Def.'s SMF ¶ 40. Plaintiff and the five new female hires attended the same training. Servello Dep. at 77:16–78:14, 79:6 –79:22. After he began, Plaintiff complained on a number of occasions to Defendant's staff that he was qualified to work as a CPSS1 and should have been hired under that title. Def.'s SMF ¶ 41; Pl.'s Resp. to Def.'s SMF ¶ 41. Plaintiff was told that Civil Service, not Defendant, makes the determination as to an employee's qualifications, and he should address any issues with Civil Service. Def.'s SMF ¶ 42.[2]

Plaintiff asserts that on February 28, 2017, Equal Employment Opportunity and Diversity ("EEOD") Director Amelia Barbadoro visited the training classroom and explained discrimination, and that later the same day he went to her office and told her he "was being discriminated against because [he] was being paid less than the five women CPSS1s for the exact same job." Servello Aff. ¶ 27; Servello Dep. at 83:17–83:22 ("Specifically I told Ms. Barbadoro that I was in a training with six female -- five females, we were performing the exact same job and duties. However, I was making less money, approximately seven thousand dollars less then them.").

### 5. Assignment to Different Shift

Plaintiff claims that on March 13, 2017, he was assigned by SCR supervisor Brian Washock to be supervised by Tracy Santangelo. Servello Aff. ¶ 30. According to Plaintiff,

---

[2] Although Plaintiff denies this, his response does not dispute that this is what Defendant's staff told him. Pl.'s Resp. to Def.'s SMF ¶ 42. Instead, it states that he also "complained to the office of Equal Employment Opportunity and Diversity and "complained to the union," and that Defendant "collaborated with Civil Service in the error." Id.

Santangelo "was not the supervisor for any of the three shifts that Servello was canvassed for and accepted." Pl.'s Resp. to Def.'s SMF ¶ 50.

Plaintiff contends that Santangelo was hostile to him from the start, and that when they first met she said to him, without further explanation, "I've been told things about you. This cannot happen." Pl.'s Resp. to Def.'s SMF ¶ 40; Servello Aff. ¶ 32. Plaintiff points out that coworkers posted a picture at Santangelo's desk of a cartoon woman holding an axe with the phrase "Some bitches say 'Oh no you didn't!' I say 'Motherfucker, I wish you would!'" Servello Aff. ¶ 31; see Dkt. No. 64-19. Eventually, she removed it from her desk area. Servello Aff. ¶ 31.

Santangelo met informally with Plaintiff on numerous occasions to discuss issues regarding his performance, in what Defendant states was an effort to help Plaintiff develop in his new role. Def.'s SMF ¶ 50. Plaintiff denies that Santangelo was committed to his development, and instead claims that Santangelo failed to appropriately substantiate specific instances of incorrect actions taken by him. Pl.'s Resp. to Def.'s SMF ¶ 50. Plaintiff asserts this failure to substantiate was "of concern" to Kristin Gleeson, "Santangelo's ultimate supervisor," but the record does not support this assertion. Pl.'s Resp. to Def.'s SMF ¶ 40; see Dkt. No. 46-2 ¶ 114 (saying that specific comments "[c]ould be helpful.").

### 6. *First Probation Report*

Defendant issued a First Probation Period Evaluation Report, dated April 3, 2017, which rated Plaintiff's quality of work and aptitude as needing improvement. Def.'s SMF ¶ 43; Pl.'s Resp. to Def.'s SMF ¶ 43; see Dkt. 63-7, Ex. 1. Plaintiff denies this is a "fair reflection of the report," in which he also received four satisfactory ratings—in the categories of quantity of work, work habits, relationship with others, and attendance—and no unsatisfactory ratings. Pl.'s Resp.

to Def.'s SMF ¶¶ 40, 43; see Dkt. 63-7, Ex. 1. This report was not prepared and signed by

Santangelo. Servello Aff. ¶¶ 25, 45; see Dkt. 63-7, Ex. 1.

### 7. Formal Counseling: June 2, 2017

On June 2, 2017, Santangelo and Washock met with Plaintiff to discuss their concerns

about his performance. Def.'s SMF ¶ 53; Pl.'s Resp. to Def.'s SMF ¶ 53. According to

Defendant, the parties discussed Plaintiff's failure to perform his duties as expected. Def.'s SMF

¶ 54. Plaintiff denies this, asserting that Santangelo instead indicated his performance had

improved. Pl.'s Resp. to Def.'s SMF ¶ 54. Plaintiff asserts that although Santangelo cited him for

using inappropriate language in saying a caller was "acting like a dick," she also said "[t]hat call

does not show the progress that you've made during the last four months you've made here."

Servello Aff. ¶ 65.

A memo from June 5, 2017 summarized the meeting, detailing Plaintiff's inability to

conduct effective and thorough interviews consistently; his omission of key information from

reports; his unclear written narratives and data entry errors; and his unwillingness to accept

feedback and apply it professionally. Def.'s SMF ¶¶ 55–58; see Dkt. No 63-7, Ex. 2. Plaintiff

denies the accuracy of these findings, alleging they were contrary to "many other findings." Pl.'s

Resp. to Def.'s SMF ¶¶ 55–58. Specifically, Plaintiff claims that "[f]our highly experienced

supervisors did not concur in the claim that [P]laintiff struggled." Resp. to Def.'s SMF ¶ 40;

Servello Aff. ¶¶ 38–39 (Brian Ishman), ¶ 42 (Laurie Smith), ¶ 47 (Chris Sullivan), ¶ 52 (Mikhail

Roberts).

Brian Ishman testified that he worked with Plaintiff one-on-one for about a month for 3 to 4 hours a day. He observed that Plaintiff "wasn't the worst person we had there." Dkt. No. 71-2, at 7, 21, 42.

Chris Sullivan testified that he reviewed only a handful of Plaintiff's calls, Dkt. No. 71-3 at 12, and wrote in an email on May 26, 2017, that Plaintiff "shouldn't be making data entry errors at all at this point" and noting that Plaintiff's reports at times "left out important information," Id. at 55–56.

### 8.  Request for Reassignment

On June 8, 2017, Plaintiff told Washock that his relationship with Santangelo was "toxic," and Washock advised hitting the "reset button." Servello Aff. ¶ 75. On or about the same date, Plaintiff asked the union to request that he be transferred to a different supervisor and was told that the request had been made. Id. ¶ 76. Plaintiff asserts this request was denied. Pl.'s Resp. to Def.'s SMF ¶ 40.

By contrast, CPSS1 Georgia Lanier, hired at approximately the same time as Plaintiff, was, on January 8, 2018, granted an extended probation period despite receiving an unsatisfactory quality of work rating in a report dated December 19, 2017. See Dkt. No. 64-25. A memo dated March 31, 2017 indicates that she was going to be assigned a new supervisor. Id.

### 9.  Formal Counseling: June 15, 2017

Plaintiff was counseled again by Santangelo and Washock on June 15, 2017, about his "attitude and professional conduct," and Plaintiff was advised that after the prior counseling session he "had difficulty accepting feedback provided by his supervisors"; the meeting was documented via memo the following day. Def.'s SMF ¶¶ 59–60; Dkt. No 63-7, Ex. 3. According

to Plaintiff, Washock told him that he had made "substantial improvement." Pl.'s Resp. to Def.'s ¶ SMF 59.[3]

### 10. Management's Conference Call

According to Plaintiff, the decision to terminate his employment was made on June 20, 2017. Pl.'s Resp. to Def.'s ¶ SMF 62. An email from Kristin Gleeson on July 20, 2017, references a conference call among SCR management staff "about a month ago"—placing it sometime in June—during which "the recommendation was to file a prob term" for Plaintiff. See Dkt. No. 64-17. The email states, "Mary Carli is aware of this individual because day 1 he was difficult in his interactions regarding being in a grade 13 traineeship." Id. It further states that of the three staff members in traineeships, Plaintiff was hired first so has been working the longest, but "[h]is performance is so far lagging in comparison to the other two that are both working at an expected level of independence and satisfactory developing work performance." Id.

### 11. Formal Counseling: June 29, 2017

On June 29, 2017, Plaintiff was counseled a third and final time regarding his ongoing difficulties, this time by Santangelo and Don Donahoue, another SCR supervisor. Def.'s SMF ¶ 61. The meeting was documented in a memo dated July 5, 2017. Dkt. No 63-7, Ex. 4. Plaintiff again denies that allegations of unprofessional conduct were warranted, contending that specific progress he had made was discussed and asserting that he audio recorded this meeting as well. Pl.'s Resp. to Def.'s ¶ SMF 61; Servello Aff. ¶ 82.

---

[3]   But this is not supported by the record, which describes Washock saying only that Plaintiff did a "great job" on a single interview Plaintiff had conducted. Servello Aff. ¶ 78.

*12. Second Probation Report and Termination*

Santangelo prepared a Second Probation Period Evaluation Report, dated July 10, 2017, that stated Plaintiff's work quality, aptitude, and relationship with others was unsatisfactory, and that his quantity of work needed improvement. Def.'s SMF ¶¶ 62–63; Dkt. No 63-7, Ex. 5. Plaintiff claims this report was drafted the same day as the final counseling meeting, June 29, citing a June 29 email from Santangelo to Kristin Gleeson purporting to transmit the report. Pl.'s Resp. to Def.'s ¶ SMF 62; Dkt. No. 64-29. Plaintiff states the quantity of his work was negatively impacted because he frequently had to wait 30–40 minutes for Santangelo before he could proceed to the next call. Pl.'s Resp. to Def.'s ¶ SMF 63; Servello Aff. ¶ 74. The Second Probation Evaluation Report recommended that Plaintiff's probation be terminated. Def.'s SMF ¶ 70; Dkt. No 63-7, Ex. 5.

Defendant states that it made the determination to terminate Plaintiff's probationary employment on or about July 18, 2017. Def.'s SMF ¶ 76. Plaintiff denies this, again claiming that the decision to terminate had been made a month prior, in a conference call between SCR management. Pl.'s Resp. to Def.'s ¶ SMF 76; Dkt. No. 64-17.

Defendant terminated Plaintiff's employment effective August 2, 2017. Def.'s SMF ¶ 78; Pl.'s Resp. to Def.'s ¶ SMF 78.

**B. Procedural History**

Plaintiff commenced this action pro se on June 29, 2018. Compl. Defendant moved to dismiss the Complaint on August 20, 2018. Dkt. No. 9. This Court granted Defendant's motion to dismiss in part, specifically dismissing without prejudice Plaintiff's unequal pay claim under the EPA and Title VII, as well as Plaintiff's Title VII hostile work environment claim, while

allowing Plaintiff's failure-to-hire Title VII claim and Plaintiff's retaliation claim under EPA and Title VII to proceed. See generally Dkt. No. 13 ("February 28, 2019 Decision"). Plaintiff retained counsel in July 2020. Dkt. No. 55. Defendant filed its motion for summary judgment on December 18, 2020. Motion. Plaintiff responded on February 2, 2021, Cross-Motion, and Defendant filed a reply on February 23, 2021, Reply.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.   DISCUSSION

### A.  Cross-Motion to Amend

The Court begins by analyzing whether Plaintiff can amend his Complaint. Because the Plaintiff has not established good cause, Plaintiff's cross-motion is hereby denied.

Pursuant to Federal Rule of Civil Procedure 15(a)(1), a party may, within certain defined time periods, amend a pleading as a matter of course. If amendment as a matter of course is not permitted, a pleading may be amended only if the opposing party consents in writing or the court grants leave. See Fed. R. Civ. P. 15(a)(2). Generally, a court "should freely give leave when justice so requires." Id. Nevertheless, it is appropriate for leave to be denied where the proposed amendment would cause undue delay or prejudice to the opposing party. Foman v. Davis,  371 U.S. 178, 182 (1962); Manson v. Stacescu, 11 F.3d 1127, 1133 (2d Cir.1993). "A proposed amendment is especially prejudicial when discovery has been completed and a summary judgment motion has been filed." Zubulake v. UBS Warburg LLC, 231 F.R.D. 159, 161

14

(S.D.N.Y.2005) (citing <u>Ansam Assocs., Inc. v. Cola Petroleum, Ltd.</u>, 760 F.2d 442, 446 (2d Cir.1985)).

Furthermore, Federal Rule of Civil Procedure 16(b) requires the issuance of scheduling orders that "must limit the time to . . . amend the pleadings." Such scheduling orders "may be modified only for good cause." Fed. R. Civ. P. 16(b). Thus, when a motion to amend is made after a scheduling order's deadline for doing so has expired, "the lenient standard under Rule 15(a) . . . must be balanced against . . . Rule 16(b)." <u>Grochowski v. Phoenix Constr.</u>, 318 F.3d 80, 87 (2d Cir. 2003). There is good cause for permitting modification of pleading-amendment deadlines where the party moving for modification has been diligent in doing so. <u>Id.</u> "Moreover, while the absence of prejudice to a non-moving party may be relevant in determining whether leave to amend should be granted under Rule 15(a), it does not fulfill the 'good cause' requirement of Rule 16(b)." <u>Carnrite v. Granada Hosp. Group, Inc.</u>, 175 F.R.D. 439, 446 (W.D.N.Y.1997) (quotation marks omitted).

Here, Plaintiff relied instead on Rule 15(a) and failed to even discuss due diligence. This is enough to deny Plaintiff's cross-motion. <u>See</u> <u>Premier Comp Sols., LLC v. UPMC</u>, 970 F.3d 316, 318–19 (3d Cir. 2020). Even if Plaintiff did address good cause or due diligence, the cross-motion still fails.

Plaintiff claims that "[a]fter further discovery was granted in part, it became clear that Plaintiff's claim for violations of the Equal Pay Act was proper—a fact only clear because of the additional discovery that occurred." Pl.'s Mem. of Law at 4. On October 29, 2020, the Magistrate Judge found that there was good cause to reopen discovery for additional depositions to be completed within 30 days. <u>See</u> Dkt. No. 62 at 5. If the depositions were completed in late

November 2020, Plaintiff did not demonstrate why he waited over two months to amend the

complaint. Furthermore, Plaintiff originally asserted EPA claims in his Complaint and Plaintiff

has not shown how these additional depositions made it possible for Plaintiff to reassert these

claims. See Mohegan Lake Motors, Inc. v. Maoli, No. 16-CV-6717, 2018 WL 4278352, at *5

(S.D.N.Y. June 8, 2018) ("The burden of showing diligence rests on the moving party."); see also

Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc., 304 F.R.D. 170, 174–75 (S.D.N.Y.

2014) (internal quotation marks and citations omitted) ("A party is not considered to have acted

diligently where the proposed amendment is based on information that the party knew, or should

have known, in advance of the motion deadline."). Thus, Plaintiff's actions do not provide good

cause for granting his cross-motion.

### B. Retaliation Claims

The Court next analyzes Plaintiff's retaliation claims under the EPA and Title VII.

To make out a prima facie case of retaliation, whether under the EPA or Title VII, a

plaintiff must allege that (1) he was engaged in protected activity; (2) the employer was aware of

that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal

connection between the protected activity and that adverse action. Lore v. City of Syracuse, 670

F.3d 127, 157 (2d Cir. 2012); see also Servello v. New York State Off. of Child. & Fam. Servs.,

No. 18-CV-0777, 2019 WL 974972, at *7 (N.D.N.Y. Feb. 28, 2019) (Kahn, J.). Once a plaintiff

establishes a prima facie case, the burden shifts to the "employer to articulate a legitimate,

non-retaliatory reason for the adverse employment action." Jute v. Hamilton Sundstrand Corp.,

420 F.3d 166, 173 (2d Cir. 2005); see also Johnson v. J. Walter Thompson U.S.A., LLC, 224 F.

Supp. 3d 296, 312 (S.D.N.Y. 2016) ("The same standard applies for retaliation claims under Title

VII [and] the Equal Pay Act....”). “Finally, if the defendant carries his burden[,] ‘the presumption of retaliation dissipates’ and the plaintiff must demonstrate that the legitimate reason offered is mere pretext for retaliation.” Sharpe v. Utica Mut. Ins. Co., 756 F. Supp. 2d 230, 238–39 (N.D.N.Y. 2010) (quoting Hicks v. Baines, 593 F.3d 159, 164–65 (2d Cir. 2010)); see also Pompey-Howard v. New York State Educ. Dep’t, 275 F. Supp. 3d 356, 366 (N.D.N.Y. 2017) (Kahn, J.).

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because the protected activity and material adverse action elements are missing. See Def.’s Mem. of Law at 18. Furthermore, Defendant claims that it articulated a non-pretextual, legitimate, and non-retaliatory reasons for Plaintiff’s termination. Id. “Despite the elaborate process set up in McDonnell Douglas, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action.” Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 199 (E.D.N.Y. 2009) (citing cases). Here, Defendant articulated a legitimate, nondiscriminatory reason: ongoing problems with Plaintiff’s work performance and behavior. Def.’s Mem. of Law at 23.

*1. Pretext*

A plaintiff may show pretext by pointing to “weaknesses, implausibilities, inconsistencies, or contradictions in the employer’s proffered legitimate, nonretaliatory reasons for its action.” Zann Kwan v. Andalex Grp., 737 F.3d 834, 846 (2d Cir. 2013). But “in order to infer pretext for a retaliatory motive from multiple justifications, a defendant’s nonretaliatory

justifications must be not merely different, but inconsistent with one another." Richardson v.

Bronx Lebanon Hosp., No. 11-CV-9095, 2014 WL 4386731, at *16 (S.D.N.Y. Sept. 5, 2014)

(collecting cases); see also Irons v. Bedford–Stuyvesant Cmty. Legal Servs., No. 13-CV-4467,

2015 WL 5692860, at *30 (E.D.N.Y. Sept. 28, 2015) ("As these varied explanations for

Plaintiffs' selection for termination are not contradictory, this . . . fails to raise a question of fact

as to whether Defendants would not have terminated Plaintiffs but for their retaliatory motives.").

Additionally, "[a]n employer's reason for an adverse action cannot be proven to be a

pretext for retaliation unless it is shown to be false and that retaliation was the real reason."

Hexemer v. Gen. Elec. Co., No. 12-CV-1808, 2015 WL 3948418, at *9 (N.D.N.Y. June 29,

2015) (Kahn, J.) (citing Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995)). Moreover,

"[i]n order to succeed on a retaliation claim after a defendant has established a legitimate,

non-discriminatory reason for the adverse action, the plaintiff must present evidence that

retaliation was the 'but-for' cause of the action." Varno v. Canfield, 664 F.App'x. 63, 66 (2d Cir.

2016) (citing Univ of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 133 S.Ct. 2517, 2533, 186

L.Ed.2d 503 (2013)) "'[B]ut-for' causation does not require proof that retaliation was the only

cause of the employer's action, but only that the adverse action would not have occurred in the

absence of the retaliatory motive." Zann Kwan, 737 F.3d at 846.

Here, Plaintiff has failed to present enough evidence to allow a reasonable jury to find

that but for the protected activity, he would not have experienced any adverse employment

actions. Plaintiff points to the following: (1) contrary to what Defendant cites in the initial

probation report, he was an adequate employee; (2) two female employees received

unsatisfactory ratings and were not terminated; (3) Mr. Ishman's, Ms. Smith's, and Mr.

Sullivan's evaluation of his work performance; (4) none of his reports were rejected and there were no particular problems on any of the randomly selected calls; and (5) the "smoking gun" explicit e-mail linking Plaintiff's complaint to his termination. Opp. at 17–19.

The Court begins by noting that points (1), (3), and (4) are variations of the same argument: contrary to Defendant's evaluations, Plaintiff was an adequate employee. However, this is not sufficient to show pretext. See Kalra v. HSBC Bank USA, N.A., 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008), aff'd, 360 F. App'x 214 (2d Cir. 2010) ("[I]t is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.") (citations omitted); see also Mello v. Siena Coll., No. 15-CV-13, 2017 WL 1013077, at *17 (N.D.N.Y. Mar. 14, 2017) (finding that a plaintiff's assertion that defendant was wrong about her poor performance was not sufficient to show pretext).

Next, Plaintiff brings up the fact that two female employees received unsatisfactory ratings, but were not terminated. Opp. at 18. This argument lacks merit. It is true that evidence of disparate treatment of similarly situated people can show retaliatory intent. See, e.g., Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); Olivier v. Cty. of Rockland, No. 15-CV-8337, 2019 WL 2502349, at *26 n.34 (S.D.N.Y. June 17, 2019) ("Plaintiffs certainly may use evidence of similarly situated comparators who were treated differently as evidence of pretext"); Campbell v. Bottling Grp., LLC, 814 F. App'x 630, 632 (2d Cir. 2020) ("Evidence that a plaintiff was treated less favorably than similarly situated comparators outside the plaintiff's protected group can raise a question of fact as to pretext"). However, Plaintiff has not

demonstrated that he was similarly situated to these two employees. See Henek v. CSC Holdings, LLC, 449 F. Supp. 3d 35, 43 (E.D.N.Y. 2020) ("[Plaintiff] has to show they were similarly situated to him in all material respects (for example, if they had a different supervisor who tolerated a violation of the no-text message rule that his supervisor did not, then the different supervisors dispel any claim that the no-text message rule was specifically applied to plaintiff because of his religion or national origin)"). As Defendant correctly notes in their Reply, the two other employees were not evaluated by the same supervisors who evaluated Plaintiff. See Reply at 8; compare Dkt Nos. 64-24 and 64-25 with Dkt. No. 63-7, Ex. 1. "Although the existence of different supervisors is not necessarily dispositive under the Second Circuit case law in determining whether two employees are similarly situated, it is obviously a very important factor." Downes v. Potter, No. 04–CV–3876, 2006 WL 2092479 at *11 n. 4 (E.D.N.Y. July 26, 2006); see also Brown v. Waterbury Bd. of Educ., 247 F. Supp. 3d 196, 209 (D. Conn. 2017) (collecting cases where comparators were not similarly situated when they had different supervisors).

Finally, Plaintiff relies on his smoking gun evidence. The full text of the e-mail is required:

> It is his overall way of being - smug, challenges supervisory direction. He thinks he knows better than supervisors and this has significantly impeded his ability to learn the job. Mary Carli is aware of this Individual because day 1 he was difficult in his interactions regarding being in a grade 13 traineeship. We had a conference call about his performance about a month ago. I apologize, I can't remember if you participated. At that lime, the recommendation was to file a prob term. The other factor is that out of the three grad 13 staff in traineeships, Matt was the first and therefore has been with us the longest. His performance is so far lagging in comparison to the other

20

> two that are both working at an expected level of independent and
> satisfactory developing work performance.

 See Dkt. No. 64-17. According to Plaintiff, "Given this explicit statement linking Plaintiff's

complaint to his termination, it is impossible to conclude that his complaints of discrimination

did not play a role in the termination of his employment." Opp. at 19. Defendant disagrees with

Plaintiff's assessment. Reply at 5–6. This is a stronger piece of evidence for Plaintiff, but the

Court finds that the email evinces no retaliatory motive. Nothing suggests that Plaintiff's

complaints were the reason for the termination, nor does it mention his complaints. Additionally,

the statement that Plaintiff cherry-picks does not link Plaintiff's complaint to his termination;

rather the context of the email indicates that Plaintiff had serious behavioral and work

performance issues.

In sum, a reasonable trier of fact could not conclude from the evidence presented that

Defendant's decision to terminate Plaintiff was motivated by retaliatory intent.

### C. Title VII: Failure-to-Hire Claim

Since Plaintiff does not contest Defendant's motion for summary judgment on his failure-

to-hire claim under Title VII, Opp. at 2, n.1, the Court will grant summary judgment in

Defendant's favor on the failure-to-hire claim. See Dipoumbi v. City of New York, No. 09-CV-

10162, 2011 WL 5966461, at *1 (S.D.N.Y. Nov. 28, 2011) ("Plaintiff, by his own admission,

'does not contest' Defendant's motion for summary judgment except as to his prima facie tort

claim. Accordingly, the Court grants summary judgment in Defendants' favor as to all claims

which Plaintiff concedes").

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's motion for summary judgment (Dkt. No. 63) is

**GRANTED**; and it is further

**ORDERED**, that the Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that Plaintiff's cross-motion to amend the Complaint (Dkt. No. 64) is

**DENIED**; and it is further

**ORDERED**, that the Clerk is directed to close this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:          September 30, 2021
                 Albany, New York

Lawrence E. Kahn
U.S. District Judge

22